## ALLAIRE WORKS, (HUBBARD v.)

[See Hubbard v. Allaire Works, Case No. 6,-814.]

## ALLDERDICE, (BOUTWELL v.)

[See Boutwell v. Allderdice, Case No. 1,708.]

## Case No. 204.

### The ALLEGHANY.

[1 Biss. 497.][1]

District Court, D. Wisconsin. Sept. Term, 1865.[2]

DUTY OF PROPELLER ENTERING HARBOR—DUTY OF TUG MEETING.

1. A steam vessel entering a harbor is bound to observe the utmost vigilance to avoid collision with other vessels, and a propeller is negligent in entering the harbor of Milwaukee at the rate of eight miles an hour.

2. Having exchanged signals with a tug towing out a schooner, she is bound to keep the side of the channel agreed upon. If she sheers or refuses to obey the helm it becomes her duty to stop.

3. The tug is entitled to half the river, and is not bound to keep close to the pier.

4. The tug with her tow had the character of a steamer going out on her own course, agreed upon with the propeller, which course she was bound to keep, and had the right to, exclusive of the propeller.

5. If she had attempted to cross the channel on seeing that the propeller sheered, and did not obey the helm, she would have done so at her own risk, and there is no obligation upon her to maneuver in reference to the course of the propeller.

[See The Daniel Drew, Case No. 3,565; The Syracuse, 9 Wall. (76 U. S.) 672; The Leo, Case No. 8,250.]

[See note to The Alleghany, Case No. 205.]

[In admiralty. Libel for collision. Decree for libelant, affirmed by circuit court in The Alleghany, Case No. 205, and that decree affirmed by supreme court, 9 Wall. (76 U. S.) 522.]

The libellant, Bernard Goldsmith, shipped on board the schooner Henry C. Winslow a cargo of oats, at Milwaukee, to be carried to the port of Buffalo. On the 7th of May, 1864, the schooner left her dock in the Milwaukee river, in tow of the steam tug W. K. Muir. It was broad daylight and clear, wind from the southwest. Shortly after leaving the dock, the captain of the tug, seeing the propeller Alleghany coming inside the piers, signaled her by one whistle to keep the starboard or right side, the usual signal, in like cases; the propeller replied by a like signal; the tug signaled a second time, when the propeller was about ten rods distant, which was replied to as before; the propeller struck the schooner on her port cat-head, cutting

---

[1][Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2][Decree of district court affirmed by circuit court in The Alleghany, Case No. 205, and decree of circuit court affirmed by the supreme court, 9 Wall. (76 U. S.) 522.]

her nearly to her keel, so that she sunk within fifteen minutes. The answer admits the signals, from the tug by one whistle, to keep to the starboard side, the tug then being above the piers, which was answered by a like signal; the second signal, when the propeller was about ten rods off, is also admitted. It is also admitted that the propeller and schooner collided between the harbor piers, and that the propeller struck the schooner, and cut into her, so that she sunk as charged in the libel. It is also admitted in the answer, "that the propeller proceeded up about the center line between the piers; that in proceeding so far to the starboard side of such channel, the propeller, drawing eleven feet two inches of water, dragged the bottom, so that she would not mind her helm; that the propeller proceeded up about the center line between the piers, gradually losing her speed." The proof was that, on account of her speed and draught of water, the propeller steered wildly, sheering from side to side, and not answering her helm. The propeller Alleghany came up to the piers from the south, having run from Chicago at the rate of about ten or eleven miles an hour; and on a strife with the propeller Maine coming in from the north, she entered the piers ahead. The rate of speed of the Alleghany entering the piers was eight miles an hour. The piers are eleven hundred and fifty feet in length, extending east and west, and about two hundred and sixty feet apart. The length of the schooner was about one hundred and thirty-seven feet. The collision occurred about two lengths of the schooner from the mouth of the river, between the piers.

Emmons & Van Dyke, for libellant, cited: Union Steamship Co. v. New York, etc., Steamship Co., 24 How. [65 U. S.] 307; Sturgis v. Boyer, Id. 110; Waring v. Clarke, 5 How. [46 U. S.] 441; Wheeler v. The Eastern State, [Case No. 17,494;] The Anita v. The Anglo-Norman, [Id. 9,174;] Clapp v. Young, [Id. 2,786;] Ward v. The M. Dousman, [Id. 17,153;] Culbertson v. Shaw, 18 How. [59 U. S.] 584; 3 Kent, Comm. 231; The Neptune, 1 Dods. 467.

E. Mariner and Wm. P. Lynde, for respondent.

MILLER, District Judge. There is the usual conflicting testimony in collision cases. Several persons who were on board the propeller as passengers and otherwise, in a set of stereotyped answers, testify that at the time of the collision she was nearer the north pier than the south. This is in contradiction of the answer and the other evidence. The answer states that the propeller kept in the center between the piers; and the proof is that at the time of the collision her bow was fifty feet south of the center, heading southwestward. It is satisfactorily shown that immediately before the collision the engines

of the propeller were reversed. It is not necessary to a correct decision of the question of fault, on the part of the propeller, to examine at length the volume of evidence submitted. The facts above stated from the pleadings show satisfactorily that the propeller was in fault. The well-established rule, that a steam vessel entering a harbor is bound to observe the utmost vigilance to avoid collision with other vessels, was not observed by the propeller in the following particulars:

1. The propeller entered the harbor from the lake at too great speed. The rate of eight miles an hour is not allowable. A steam vessel entering between the piers from the lake, even on slackening her speed by shutting off steam when inside, may not be in condition to stop or reverse in time to avoid collision with vessels under way out. "There being no usage as to an open way, the vigilance is thrown upon the entering vessel. Ordinary care under such circumstances will not excuse a steamer for a wrong done." The length of the piers is too short and the space between them too narrow to admit the ordinary maneuver of vessels in the open sea to avoid collisions. The collision occurred about nine hundred and thirty feet from the outer end of the piers. At the rate of eight miles an hour, the propeller would reach that point in less than one minute. If checked in speed one-half on her way up, she would reach that point in one minute and one-half. By running in at that rate, and a tug with a schooner in tow in full view of meeting her, the propeller must take the responsibility.

2. The signal was given the propeller in due time to keep to the right side, which was answered in like manner. It then became the duty of the propeller to keep the right or north side of the center between the piers, which she did not; and at the moment of the collision her bow was about fifty feet south of the center, heading into the schooner.

3. When the propeller sheered, and did not answer her helm to the starboard, steered wildly and was unmanageable, it was the duty of the master to stop her until the tug and schooner had passed. The propeller had full power to stop at any time, and to reverse. She did not stop in time to avoid the collision.

It is alleged that the tug was in fault for not keeping close to the south pier, and out of the way of the propeller. The tug was entitled to one-half the channel or space between the piers. The signals settled that matter between the propeller and the tug. The captain of the tug even on seeing that the propeller sheered, and did not answer her helm a-starboard, would have risked collision at his expense by running the tug in reference to the course of the propeller, or to have steered towards the north pier. There was no obligation upon the tug so to maneuver at its own risk of condemnation in case of collision. The tug was on its own course, and had the right of it, exclusive of the propeller. It is true that the tug was not in the range of a sailing vessel, requiring steamboats to keep out of the way. The tug had the character of a steam vessel, going out of port, on its own course, agreed upon with the propeller, which it was bound to keep. The wind being from the southwest, although not very strong, yet striking the schooner on her starboard, it is not probable that she would be a-starboard of the tug. It would require a quick movement on the part of the tug to bring the schooner into line at the point of entrance into the piers. The tug at the time of the collision was heading south-eastward, and could not have advanced much further on that course without running on the south pier. In this movement the tug was making way for the propeller.

In the answer it is stated, "that the master of the propeller saw the schooner descending the river in tow of a tug. He immediately caused the steam to be shut off entirely from the engine of the propeller, in order that the schooner might get between the harbor piers before he met her. And that when the schooner had got within five hundred feet of the propeller, the master of the propeller saw that the vessels, if they proceeded at the speed at which they were going, and upon the same courses, must meet in the bend of the river where it turns out of the old channel to come into the straight cut between the piers, gave the order to the engineer to reverse the engines of the propeller, and that thereupon the engines were immediately reversed." The tug and schooner being in the bend of the river where it empties into the straight cut between the piers, and the captain of the propeller, knowing that to be a difficult point of navigation, particularly for a tug with a vessel in tow, and requiring an effort at that point on the part of the tug to keep its tow in line, preferred meeting them inside the piers, where there was less danger of collision. Whatever fault there was, consisted in the propeller running up too far. The tug was running at a rate of between three and four miles an hour, and if the propeller was then running at four miles an hour, it is evident that a collision must occur before the propeller could assume a backward movement. It was also argued, that the tug was in fault for allowing the men on board the schooner to be setting sails coming down the river. It was a matter of duty and of necessity to prepare the vessel for navigation and protection, before passing out into the open lake. In less than two minutes, if the collision had not occurred, the schooner would have been cast loose from the tug in the lake. It was alleged that the master of the tug, seeing the unmanageable condition of the propeller, in not answering her helm, should have stopped. If the tug could have stopped, what would have become of the schooner?

She could not ·be stopped-·short of being· turned completely around in the way of the propeller, and with greater certainty of col-·lision. From examination of the pleadings .and evidence, my opinion is, ·that the propeller is in sole fault of the collision, and a de-cree is ordered accordingly.

NOTE, [from original report.] As to duty of steamer in crowded harbor, see The Corsica, 9 Wall. [76 U. S.] 630; The Johnson, Id. 146; The City of· Paris, Id. 634; The Syracuse, [Case No. 13,718:] Brunswick v. ·The Sea Gull, Case No. 12,578. As to duty of tug, Horn v. The Anthracite, Case No. 6,412; ·Smith v. The Creole, Case No. 13,033:. Sproul v. Hemmingway, 14 Pick. 1; The· Express, [Case No. 4,596;] Snow v. Hill, 20 How. [61 U. S.] 543; New York, etc., Transp. Co. v. Philadelphia, etc., Nav. Co., 22 How. [63 U. S.] 461. Boats in tow and exclusively under the control of the tug, are, as respects other vessels, to be considered vessels under steam. The Pennsylvania, [Case No. 10,946.] A tug with a tow lashed alongside is considered as one vessel and that a steam vessel, and must follow the rules of steam ·vessels. Railroad Co. v. The Manton, [Case No. 7,319.]